Hollingsworth vs. Chaffe.

## No. 7751.

### WM. W. HOLLINGSWORTH VS. JOHN & CHARLES CHAFFE.

A mortgage upon a plantation attaches to the *batture*, which is formed in front of the said plantation subsequently to the act of mortgage.

The seizure and sale of the plantation, at the suit of the mortgage creditor, carries with it the seizure and sale of the *batture*, as part of the property mortgaged, seized and sold, and the said *batture* passes with the plantation to the purchaser.

APPEAL from the Fourth Judicial District Court, parish of St. John the Baptist. *Duffel*, J.

### S. M. *Bérault* for Plaintiff and Appellant :

First—It is a rule of property that, if at the time of the sale of riparian land, the alluvion attached has attained a *sufficient* elevation above the water to be susceptible of private ownership, *the alluvion does not pass with the land, unless so expressed*. That test has been definitely settled by repeated decisions of this Court. Barre vs. City, 22 An. 612-615; citing 6 M. 19-215; 9 M. 656; 7 N. S. 624; 11 L. 142; 10 An. 54-55; 13 An. 350; 18 L. 229. This rule applies to rural batture, and is not confined to urban alluvion. 9 M. 222-240-236; 7 N. S. 81; 18 L. 259.

Second—Such was, on or before the the 3d August, 1867, or 2d April, 1870, the batture in contest, in front of the levee of 1839, on Woodlands Plantation, adjudicated to defendants on the 2d April, 1870, as measuring 14 arpents front on the Mississippi river. With that description defendants' title stopped at that levee, and did not pass to them the batture which has an area of 86 to 100 arpents, on which sugar and corn has been raised.

Third—If the title to the batture, on the 2d April, 1870, was not in defendants, on the hypothesis of elevation at that date, then it must have been in either Mrs. Hollingsworth or in her husband at that period.

If the batture had not the required elevation when Mrs. Hollingsworth purchased on the 3d August, 1867, then it passed with the land to her as an accession.

If *subsequent* to the 3d August, 1867, when Mrs. Hollingsworth bought, and *prior* to the 2d April, 1870, when defendants purchased, the batture attained the necessary elevation, then it was the property of Mrs. Hollingsworth, and did not pass to defendants.

If *prior* to the 3d August, 1867, when Mrs. Hollingsworth purchased Woodlands, the batture was sufficiently elevated, then it belonged to Saml. Hollingsworth, in his own right, and as heir of his father Jacob.

In either hypothesis, the title to the batture passed to plaintiff by the acts of 19th February, 1872, and the 20th October, 1877, as the transferee or vendee of his father or mother.

Fourth—Article 45 C. P. says: " The petitory action may be brought by one who has the ownership only of an undivided part of an estate or of a real right to which such an estate is subjected, though his ownership may be limited to a certain period, or end by the occurrence of a certain event." 8 N. S. 171; 14 An. 537.

A joint proprietor, or heir, or co-partner, can maintain petitory action for the whole undivided property, against a mere trespasser without title. 6 An. 232, 531-2; 11 M. 713; 6 L. 653; R. C. C. 77 (78); Pothier de la Propriete, Nos. 414, 415, fully support us in this position.

Fifth—"It is admitted that Jacob Hollingsworth, Junior, a son of Jacob Hollingsworth, deceased, and a brother of Saml. Hollingsworth, father of plaintiff in this case, is now living, and is a resident of Mississippi City, State of Mississippi, and that both Samuel and Jacob Hollingsworth, Junior, are sons of Jacob Hollingsworth." See Admission, p. 31, l. 29 to p. 32, l. 8.

But it is nowise admitted that Jacob Hollingsworth, Junior, *has ever accepted the succession of his father*, Jacob Hollingsworth. Samuel has accepted.

Sixth—In forced sales, the law neither requires nor presumes the debtor's assent. Such a sale is not a voluntary one, and is strictly construed, and cannot be enlarged or extended by mere implication. Duclaud vs. Rousseau, 2 An. 168, and authorities there citied. Pothier, Propriete, No. 274.

At all forced sales the purchaser must look to the legal description of the seized property, and if that description does not in point of law, include and cover the elevated batture, the latter does not pass with the land described as fronting on the river, i. e. the levee.

Seventh—The issue *is how much land was conveyed* to defendants by the forced sale of the 2d April, 1870, and NOT *how much land or batture* was *subjected* to the mortgages of 1840, granted to the Consolidated Association, and on which that sale was based. Defendants foreclosed on those mortgages and *did not* seize, advertise and sell the batture then susceptible of private ownership. They seized only the land in the rear of the levee of 1839.

Eighth—Alluvion in its incipiency and development, *before* it has attained a sufficient elevation above the waters to be susceptible of private ownership, is an accessory to the land, to and before what it attaches, and may pass with the sale of the land. But alluvion or *batture above the waters is no longer an accessory, but becomes a principal estate or field*, and *as such requires express words of description and of conveyance to pass or alienate it.* 22 An. 612.

*E. & J. Legendre* for Defendants and Appellees.

*Spencer & White* on the same side:

First—The mortgage under which defendants bought, having been consented, in 1840, prior to the formation of the batture, the latter became a part of the mortgaged property, and was stricken with the mortgage. C. C. 3310, 498, 509; C. N. 2133, 551 and 556; Digest Book 20, Tit. 1, Laws 13 and 16; Chardon, Droit D'Alluvion, p. 5; Fenet, vol. 15. pp. 361, 362; Paul Pont, Priv. and Hypo., vol. 1, pp. 396, 397, No. 406; Troplong, Priv. and Hypo., No. 551; Grenier, vol. 1, No. 148; Duranton, vol. 19, No. 257.

Second—The alluvion becoming *a part* of the thing mortgaged, the sale of the whole of the mortgaged immovable was a sale of the part. The part was contained in the whole. Williamson vs. Richardson, Sheriff, 31 An. pp. 685, 686.

The opinion of the Court was delivered by

TODD, J. This is a petitory action for the recovery of the batture in front of the Woodlands plantation, in the parish of St. John the Bap-

tist, on the Mississippi River, in possession of the defendants, and for the rents and revenues of the same.

The plaintiff sets up title to the property under an act of sale from Mrs. E. M. Hollingsworth, dated February 19, 1872, and an act confirmatory of this sale, signed by Mrs. Hollingsworth and her husband, Samuel Hollingsworth, the father and mother of the plaintiff, dated on the 20th of October, 1877.

The defendants claim the property under a sheriff's sale, made on the second of April, 1870, in a suit or proceedings entitled John Chaffe & Brother vs. Mrs. E. M. Hollingworth.

The plaintiff is the appellant from a judgment rendered in the court below in favor of the defendants.

Mrs. E. M. Hollingsworth acquired the Woodlands plantation at a sheriff's sale, on the third of August, 1867, under a judgment in favor of Seraphin Millet against Jacob Hollingsworth and Samuel Hollingsworth, the grand-father and father of the plaintiff, who, prior to and at the time of said sale, were the equal and joint owners of said plantation.

In the sheriff's deed to Mrs. Hollingsworth of the third of August, 1867, and the subsequent deed to defendants of the second of April, 1870, the property is described as follows:

" A certain sugar plantation, situated in the parish of St. John the Baptist, in this State, on the left bank of the Mississippi River, measuring fourteen arpents, more or less, front on said river, by forty arpents in depth by side lines opening in the rear," etc.

The plaintiff claims in his petition that the batture in question was not conveyed or included in either of these sales, but that the title thereto remained first in the former proprietors of the Woodlands plantation—Jacob Hollingsworth and Samuel Hollingsworth—and subsequently in the latter, in his own right, and as heir of the former, until acquired by him, plaintiff, under his purchase, as set forth in the petition.

This claim is based, substantially, on the fact asserted by the plaintiff, that this alluvion or batture, subsequent to the year 1853 and prior to the year 1867, had reached and obtained a full and sufficient elevation above the waters of the Mississippi River to be susceptible of private ownership, occupancy and cultivation by the said Samuel Hollingsworth, plaintiff's vendor, and Jacob Hollingsworth, the deceased father of Saml. Hollingsworth, the joint owners of the plantation and the alluvion in front of it; and that in consequence of this fact it did not pass to the purchasers under the sheriff's sales mentioned, because it was not expressly included in the adjudications and sales, as sold and conveyed with the plantation. In other words, that from the condition of the batture, its elevation above the waters of the river, it had ceased to be a mere ac-

cessory to the Woodlands plantation, and had become an independent and separate estate, and as such, did not pass from the then proprietors by the successive sheriff's sales mentioned. That Mrs. Hollingsworth did not acquire it in 1867, because the sale to her of the plantation contained no words of conveyance of the batture; and that the defendants in 1870, by their purchase, acquired no other or greater right than Mrs. Hollingsworth had—against whom their proceeding was directed, and to whose title they succeeded.

And the issue thus presented, whether this batture did or did not pass, first, to Mrs. Hollingsworth, and subsequently to the defendants, by virtue of these sheriff's sales, is the sole one for our determination.

Few questions have given rise to more complicated and protracted litigation, and have been the subject of more learned research, than the question of alluvion. The principle of accretion, on which it is founded, has, in every known system of jurisprudence, been recognized as one of the modes for the acquisition of property.

We find in the Digest of Justinian, lib. 41, tit. 1, law 7, the following enunciation on this subject :

"*Præterea, quod per alluvionem agro nostro flumen adjicit, jure gentium nobis acquisitus. Per alluvionem autem id videtur adjici, quod ita paulatim adjicitur, ut intelligere non passimus quantum, quoque momento temporis, adjiciatur.*"

This text has furnished the source of the law on this subject to every country or people which has derived its system from Rome. Thus we read in the Partidas (lib. 3, Tit. 28, L. 26):

"Crescen los rios a las vegadas de manera, que tuellan y men-guan a algunos en las herèdades que han en las riberas dellos; y dan y acres-cen a las atras que las han, de la otra parte. Et por ende decimas, que todo quanto los rios tuellan a las hombres poco a poco, de manera que non puedan entender la quantidad dello, porque lo non llevan ayun tadamente, que lo ganan los senores de aquellas heredades, a quien lo ayuntan; y las otras, a quien lo tuellan; non han en ello que veer."

This identical principle is more aptly expressed in Art. 509 of our Civil Code, which is but a reproduction, with a very slight exception, of Art. 556 of the Code Napoleon:

"The accretions which are formed successively and imperceptibly to any soil situated on the shore of a river or other stream, are called alluvion."

"The alluvion belongs to the owner of the soil situated on the edge of the water, whether it be a river or stream, and whether the same be navigable or not, who is bound to leave public that portion of the bank which is required by law for the public use."

Notwithstanding, however, the antiquity of this principle, so univer-

sally adopted, and the plain and precise terms in which it has been enunciated, it has been, as stated, the fruitful source of litigation, as evidenced by very many long, elaborate and learned decisions of this Court. This litigation has been caused not so much by any obscurity in the law, but from the great difficulty of applying the law to the many varied and peculiar circumstances and conditions connected with and distinguishing the alluvions of the rivers, bayous and streams of Louisiana.

These alluvions are sometimes designated as battures, and are especially on the Mississippi River generally known by that name.

The word " batture " is thus defined by Judge Martin in the celebrated case of Morgan vs. Livingston, 6 M. 216:

" Batture is, according to Richelet and the French Academy, a marine term, and is used to denote *a bottom of sand stone or rock mixed together and rising towards the surface of the water;* its etymology is from the verb *battre,* to beat: because a batture is beaten by the water. In its grammatical sense, as a technical word, and in common parlance, it is then an elevation of the bed of a river *under* the surface of the water, since it is rising towards it. It is, however, sometimes used to denote the same elevation of the bank, when it has arisen *above* the surface of the water, or is as high as the land on the outside of the bank."

From the various decisions of this Court on the subject, we deduce the general rule, subject to some exceptions, that if at the time of the sale of a riparian estate, the alluvion or batture attached, has attained a sufficient elevation to be susceptible of private ownership, the alluvion does not pass with the land unless so expressed in the act or acts of sale.

6 M. 19; 9 M. 656; 18 L. 229; 22 An. 613.

The counsel for the defendants, in their learned and elaborate briefs, deny that this rule applies to rural estates, such as plantations, *sold in the gross and not by the measure;* and contend that it must be strictly confined, if it exists at all, to urban property. They further urge that, even if such a rule can be sanctioned, as applicable to rural estates, in the case at bar, the batture in dispute had not, in point of fact, attained that elevation at the date of the sheriff's sale, under which the defendants acquired, as to render it susceptible of private ownership; and upon this issue a great deal of testimony was taken, appearing in the record.

From the view we have taken of this case, after mature and thorough deliberation, we do not deem it necessary to its determination, to decide these difficult questions of law and facts thus presented. The record presents another feature in the case, which must exercise a controlling influence in its determination.

We find that the sale of the Woodlands plantation was made to the defendants under a special mortgage, dating as far back as April, 1840. It is declared in the petition that this batture was formed or attained a condition rendering it susceptible of ownership, between the years 1853 and 1867, during which entire period the property or principal estate was subject to the operation of the mortgage in question. Art. 3310 R. C. C. declares:

"The conventional mortgage when once established on an immovable includes all the improvements which it may afterwards receive."

This article is identical with Art. 2133 of the Code Napoleon, the latter article having the word "*ameliorations*" for the word "improvements" in the English text, which serves to explain the English word, by showing it to mean "improvements" resulting both from natural and artificial causes; and thus broadening its signification to make it correspond with the word "betterments," so aptly used in the phraseology of the common law.

The question here arises whether this word "improvements" embraces alluvions or battures becoming attached or united to the original estate mortgaged during the existence of the mortgage. Or, in other words, does such batture become stricken with the mortgage? The authorities leave no doubt on this point. The principle bearing on it is thus enunciated in the Roman law:

"*Si fundus hypothecæ datus sit, deinde alluvione major factus sit, totus obligabatur.*" Digest lib. 20, tit. 1, Law 16.

In the deliberations over the Code Napoleon, when this provision extending the operation of mortgages to "ameliorations" or "improvements" was reported, we find the following discussion was had:

"M. Galle demande une explication. Si dit-il, l'héritage grevé d'hypothèque se trouve considérablement agrandi, soit par alluvion, soit parce que le fleuve qui l'avoisine a changé de lit, l'hypothèque s'étend-elle sur l'accroissement? Cette question s'est élevée quelquesfois dans le ci-devant Piemont et ailleurs. M. Frielhard dit que les accroissements produits par l'effet de l'alluvion sont insensibles et deviennent ainsi des parties du même fonds. Il n'y a donc point de doute qu'ils ne supportent l'hypothèque."

Fenet, vol. 15, pp. 361, 362.

Paul Pont, on the same subject, says:

D'abord, et sans difficulté aucune, elle s'applique aux accrues qui si font par alluvion, à cette accrue qui selon l'expression de Lebrun, se fait de la même manière que l'accroissement et le progrès d'une plante, de telle sorte qu'on ne peut ni distinquer le moment où il se fait, ni le séparer de l'héritage auquel il se fait. Ainsi, l'hypothèque assise sur l'immeuble profitera de l'augmentation produite par cette sort d'atterisse-

ment ou d'accroissement, quelque considérable qu'il puisse devenir à la longue."

Paul Pont, Priv. and Hypo., vol. 1, pp. 396, 397.

Many other authorities might be cited on this point, but we think these are conclusive; nor do we understand that this principle is seriously questioned by the plaintiff's counsel.

If the alluvion or batture in controversy became stricken with the mortgage to which the Woodlands plantation was subject from 1840; then the only remaining question left to consider is, whether this batture was affected by the proceedings for the enforcement of the mortgage, under which the adjudication was made, and by which the defendants claim title to the property. Was this batture seized and sold under these proceedings? If so, it passed to the defendants with the Woodlands plantation, of which it had become a part. C. C. 498, 504. If not, the title to it remained in the former proprietors, under whom the plaintiff claims.

The proceedings which culminated in the sale, were instituted against the *mortgaged* property—the property *subject* to the mortgage; and we must conclude that by the effect of these proceedings the *entire* property, so subject to the mortgage, passed to the purchasers, unless there was something in these proceedings—as for instance, in the advertisement or description of the property—to show that the creditors enforced their mortgage, not against the entire property, but only against a part; not against the property originally mortgaged, *with all its augmentations*, whether by alluvion or destination or artificial ameliorations, but only and exclusively against the land as it existed in 1840, when the mortgage was consented. It might seem somewhat singular if a creditor with a mortgage covering the whole, and that mortgage indivisible, would proceed to enforce it against *a part*, when it was evident that it would require *the whole* to satisfy the mortgage debt. It is reasonably certain that such was not the *intention* of the creditor; and we should not conclude that such was the *fact* unless the evidence forbids any other conclusion. We do not discover any evidence in the record that would give to the proceedings such limited effect. It appears that the property, or plantation, was described in the act of mortgage as *fronting on the river;* and from the admissions of the parties, to supply the acts of mortgage and sale not copied into the transcript, we must presume that the property was described alike in the act of mortgage, and the several acts of sale. Such description does not exclude any part of the property, but on the contrary, is sufficient to include the entire property subject to the mortgage, the Woodlands plantation and all the augmentations thereto, since the date of the mortgage. The sale of mortgaged property carries with it all these

augmentations and improvements without any specific description of them being necessary. They had become a part and parcel of the property, on the principle declared in Art. 504 C. C., viz:

"All that becomes united to or incorporated with the property, belongs to the owner of such property."

And in Art. 499:

"The ownership of a thing, movable or immovable, carries with it the right,    *    *    *    and all that becomes united to it either naturally or artificially."

A question similar to the one here presented came up in the case of Williamson vs. Richardson, sheriff, et al., decided by our immediate predecessors, 31 An, 685.

In that case the Court said :

"Although the writ issued only against the mortgaged premises, it necessarily issued against the immovables by nature or destination which were a part of those premises. There is no pretense that the things seized and not described *eo nomine* in the writ and act of mortgage were not such immovables. The order to seize and sell the mortgaged property was an order to seize and sell all of it—not a part but the whole, and the sheriff would have been liable in damages had he failed to levy under the writ on those things which, by operation of law, were part of that which the writ covered."

Under this view of the subject, we conclude that the defendants at the sheriff's sale on the 2d April, 1870, acquired the property in controversy, and that plaintiff has no title thereto.

The judgment appealed from is, therefore, affirmed with costs.

Justice Poché recuses himself, having been of counsel.

Rehearing refused.